# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

\* \* \*

In the Matter of the Extradition of
CHARLIE ATONG ANG

2:02-cv-00433-KJD-LRL

## EXTRADITION CERTIFICATION AND ORDER OF COMMITMENT

These extradition proceedings were commenced by the United States pursuant to 18 U.S.C. § 3184 and its obligations under its 1995 Extradition Treaty with the Republic of the Philippines (hereinafter "the Treaty"). Charlie Atong Ang's extradition is sought by the Philippines for prosecution for the offense of plunder. Specifically, Ang has been charged with "conniving" with former President Joseph Estrada in converting 130 million pesos of tax money for his personal use, and in receiving proceeds from illegal gambling schemes.

As part of its extradition determination, the court finds and certifies that the following facts have been established or have not been disputed:

1. That there is an extradition treaty in force between the United States of America and the Republic of the Philippines (the Treaty), and this court has jurisdiction in this matter;

2. That the individual who appeared before this court, Charlie Atong Ang, is the same person who is named in the Philippines in the arrest warrant issued on April 25, 2001 by the Chairman of the Third Division of the Sandiganbayan;

3. That Charlie Atong Ang is charged in the Philippines in an Amended Information in Criminal Case No. 26558 with having committed the crime of Plunder in violation of Republic Act No. 7080, as amended;

4. That the crime with which Charlie Atong Ang is charged is an extraditable offense

within the meaning of Article 2 of the Treaty;

5. That dual criminality is satisfied in this matter inasmuch as the conduct for which extradition is requested is criminal under the laws of both the Republic of the Philippines and the United States; and

6. That the evidence establishes probable cause to believe that Charlie Atong Ang has committed the charged offense.

The only remaining questions are whether the political offense exception set forth in Article 3.1 of the Treaty is applicable in this case, and whether the Philippines has provided adequate assurances, as required by Article 5.1 of the Treaty, that if the death penalty is imposed it will not be carried out.

**I. Political Offense Exception**

Article 3.1 of the Treaty provides that "[e]xtradition shall not be granted if the offense for which extradition is requested is a political offense." Compl. #1 at 26. The task of defining "political offense" is left to the courts. Political offenses generally fall within two distinct categories: pure political offenses and relative political offenses. *In re Extradition of Singh*, 170 F. Supp. 2d 982, 995–96 (E.D. Cal. 2001). Pure political offenses are acts aimed directly at the government and do not contain any of the elements of ordinary crimes. *Id.* at 996 (citation omitted). "Relative political offenses, on the other hand, are otherwise common crimes committed in connection with a political act or common crimes committed for political motives or in a political context." *Id.* "The political offense exception applies when the nexus between the crime and the political act is sufficiently close." *Id.* (internal quotes omitted). American courts use the "incidence test" to determine whether such a nexus exists. *Quinn v. Robinson*, 783 F.2d 776, 806 (9th Cir. 1986); *Barapind v. Enomoto*, 400 F.3d 744, 750–51 (9th Cir. 2005); *Vo v. Benov*, 447 F.3d 1235, 1241 (9th Cir. 2006). "The incidence test has two components—the 'uprising' requirement and the 'incidental to' requirement." *Quinn*, 783 F.2d at 806. Criminal conduct will be subject to the political offense exception only if the criminal conduct (1) occurs during a violent uprising, *i.e.*, "a revolt by indigenous people against their own government or an occupying power," and (2) is "causally or ideologically related to the uprising." *Id.* at 807-809.

"The uprising prong constitutes the critical part of the incidence test." *Vo*, 447 F.3d at 1241 (citing *Quinn*, 783 F.2d at 806). A number of factors must be shown in order for an individual's conduct to be protected by the political offense exception. Specifically, a certain level of violence must exist, the uprising must occur within the country in which those rising up reside, the alleged offense must be committed in that geographic area, and the individual charged must be seeking to change the form of the government under which he lives. *Id.* at 1241 (citing *Quinn*, 783 F.2d at 807, 813–14, 818). The exception does not cover "acts that involve less fundamental efforts to accomplish change or that do not attract sufficient adherents to create the requisite amount of turmoil." *Quinn*, 783 F.2d at 807 (citing *Escobedo v. United States*, 623 F.2d 1098 (5th Cir. 1980)).

Ang argues that the uprising component should not be interpreted to require acts of violence because the *Quinn* court used the words "turmoil" and "violence" interchangeably, the court was addressing the proposed narrowing of the exception, and the exception should not preclude peaceful efforts to seek political change. Mot. (# 150) at 15. The government maintains that violence is a necessary component of the test. The court agrees.

First, the Ninth Circuit recently reaffirmed the requirements of the incidence test, including the violence component. *Barapind v. Enomoto*, 400 F.3d 744, 750–51 (9th Cir. 2005) (en banc) (per curiam). Second, the "narrowing" analysis which Ang claims vitiates the absolute requirement for violence was made in respect to some courts' biased application of the exception. *Quinn*, 783 F.2d at 803–04. The *Quinn* court was speaking of the need to refrain from applying American sensibilities to requests for the extradition of those accused of violent political acts committed outside the context of organized military conflicts. The court did not contemplate non-violent uprisings. *See Id.* at 803–05. Ang's argument that peaceful movements to achieve political change should not be excluded from the exception does not square with the law. Indeed, "peace" and "Uprising" are antonyms. The types of crimes generally contemplated by the political offense exception simply do not transpire within a peaceful framework.

The degree of violence in the Philippines at the time of Ang's conduct did not reach the level

3

necessary to characterize it as an "uprising." Estrada's presidential campaign was not an uprising or other violent political struggle to displace an occupying power. *See Quinn*, 783 F.2d at 807. Indeed, Estrada was elected through a democratic process; he did not wrest power from the opposing party through violent rebellion or revolution.

Ang argues alternatively that the level of violence surrounding the *ouster* of Estrada meets the violence requirement of the uprising component. Ang states that at least a couple of million citizens marched on the street outside the President's official residence, Malacanang, to demand Estrada's release and reinstatement. After six days of peaceful assembly the crowd broke away and marched on Malacanang. The crowd was met with gunfire and six civilians were killed and 111 wounded by the military deployed by Arroyo. Mot. (# 150) at 8. The application of this aspect of the uprising prong in other cases clearly demonstrates by comparison that the degree of violence during Estrada's ouster did not reach the level of an uprising. In *Quinn*, an uprising occurred in Northern Ireland because there had been "a number of bombing campaigns" during a very long and frequently violent period of conflict between Irish nationalists and the United Kingdom. *Vo*, 447 F.3d at 1242 (citing *Quinn*, 783 F.2d at 812–13). The Ninth Circuit in *Barapind* found that tens of thousands of deaths and casualties in a clash between Sikh nationalists and government officials constituted "substantial violence" that rose to the level of an uprising. *Barapind*, 400 F.3d at 750. "Similarly, a continuing clash between indigenous people and police in northern Canada that was 'not just an isolated violent disturbance' but part of a long history of struggle between native people and the government of Canada was found to constitute an uprising." *Vo*, 447 F.3d at 1242 (citing *United States v. Pitawanakwat*, 120 F. Supp. 2d 921, 935 (D. Or. 2000)).

The burden of proving the existence of a movement against the Philippine government that involves sufficient violence to rise to the level of an uprising is on Ang as the party presenting an affirmative defense to extradition. *Vo*, 447 F.3d at 1242 (citation omitted). Ang has not met his burden. Even if the court construed all the evidence in his favor, Ang still cannot show a sustained and widespread degree of violence that constituted an uprising.

4

1    Ang argues that the court in *Quinn* endorsed a functional-based approach when extradition is
2 requested for a person who commits crimes while he or she is a government official. Mot. (#150) at
3 13, 16. The government counters that *Quinn* did not create, and the court should not use, a new political
4 offense test. Moreover, even if the court were so inclined, which it is not, Ang was not, and has never
5 been, a government official.

6    Ang's claim that *Quinn* developed an alternate test is based largely on footnote 24 in the *Quinn*
7 decision. In dicta, the court stated that "it can be argued that while the incidence test may be
8 inappropriate for evaluating the extraditability of former government officials, the exception itself is
9 applicable and a different test should be devised for use in such cases . . . . However, we leave these
10 questions for resolution in future cases." *Quinn* 723 F.2d at 801 n.24. Thus, a new test was not created;
11 rather, the court left unresolved the issue of whether the incidence test should apply to government
12 officials acting in furtherance of a government policy. This court need not reach this issue, however,
13 because Ang was not a public official at the time of the alleged plunder.

14    Finally, even if the court were to find that there was an uprising during which the alleged
15 plunder took place, Ang does not show how the alleged criminal conduct itself was in furtherance of,
16 or causally or ideologically related to, the uprising. The court therefore concludes that Ang's alleged
17 criminal conduct is not protected by the political offense exception.

**II. Adequate Assurances the Death Penalty Will Not Be Imposed**

19    The adequate assurances argument is now moot. The Philippines repealed the death penalty on
20 June 24, 2006. The repeal took effect on June 29, 2006. Gov.'s Notice # 164.

21                    * * *

22    For the foregoing reasons, the court certifies that Charlie Atong Ang is extraditable.
23 Accordingly, this matter is certified to the Secretary of State in order that a warrant may issue for the
24 surrender of Charlie Atong Ang to the proper authorities of the Republic of the Philippines in
25 accordance with the Extradition Treaty between the United States of America and the Republic of the
26 Philippines.

1  IT IS ORDERED that Charlie Atong Ang be committed to the custody of the United States Marshal, or his authorized representative, to be confined in appropriate facilities and to remain until such surrender shall be made to the Republic of the Philippines pursuant to applicable provisions of the Treaty and United States law.

IT IS FURTHER ORDERED that Charlie Atong Ang shall surrender to the United States Marshal not later than September 13, 2006, at 12:00 p.m.

IT IS FURTHER ORDERED that the United States Attorney for the District of Nevada shall forward to the Secretary of State a certified copy of this Certification and Order together with a copy of all transcripts of proceedings and documents received in evidence in this matter.

DATED this 11th day of September, 2006.

_____
**LAWRENCE R. LEAVITT**
**UNITED STATES MAGISTRATE JUDGE**